IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| DEIRDRE GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:15-cv-00628-LSC |
| | ) | |
| FAYETTE MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

### I. INTRODUCTION

Plaintiff Deirdre Greene ("Greene") brings this action against her former employer, Fayette Medical Center ("FMC"), alleging that she suffered discrimination on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII). Before this Court is FMC's Motion for Summary Judgement and Supplemental Motion for Summary Judgment. (Docs. 19, 48, & 49.) For the reasons explained herein, FMC's motions are due to be granted.

### II. FACTUAL BACKGROUND

Greene began working at FMC, which is part of the DCH Health System ("DCH"), in July 1992 upon her completion of radiology school and was continuously employed by FMC until her termination in March 2014. During her employment at FMC, Greene worked as a radiology technician conducting MRI scans and similar procedures.

## A. GREENE'S KNOWLEDGE OF FMC AND HIPAA PRIVACY PROCEDURE

Greene received regular training on FMC privacy policies and HIPAA confidentiality requirements. Greene certified that she understood FMC's Confidentiality Acknowledgement & Agreement Forms (the "Confidentiality Forms") once a year from 2008 to 2014. (*See* Doc. 20 at 85-98.) The purpose of the Confidentiality Forms was to inform FMC employees of their "personal and professional responsibilities regarding confidential information and receive an acknowledgment of understanding." *See, e.g.*, *id.* at 85. The Confidentiality Forms also advised employees that as part of their jobs they were being given access to "Protected Health Information" ("PHI") governed by the Health Insurance Portability and Accountability Act ("HIPAA") security regulations. *Id.* The confidential information as defined under the Confidentiality Forms included "[m]edical and certain other personal information about patients." *Id.* Access to the confidential information should be limited to "legitimate medical need" using

the "minimum necessary access." *Id.* The Confidentiality Forms also clarified that "failure to comply with my confidentiality obligation may result in disciplinary action or termination of my employment/educational affiliation by the DCH Health System and its affiliates." *Id.* at 86. Greene stated that she fully understood the policy reflected in the Confidentiality Forms and FMC's HIPAA policy. (Greene Depo. at 53-64.)

Greene also underwent computer-based training on "HIPAA Privacy and Confidentiality." (Doc. 21 at 1.) The training module took the form of a fifty-slide PowerPoint that repeatedly stresses protection of patient confidentiality and HIPAA compliance. The training module warned trainees that they have an obligation to protect "Protected Health Information" ("PHI") from those who "don't 'need to know.'" (Doc. 21 at 7.) PHI is defined non-exhaustively on the following slide to include written and verbal information about physical and mental health, as well as information specific to an individual such as address, date of birth, and social security number. *Id.* The training module stresses repeatedly that violation of these policies may result in the employee's termination. *Id.* at 3, 6, 11, 15, & 24. Specifically, "[d]isclosing PHI to another person *without authorization* will result in termination." *Id.* at 11 (emphasis added).

Greene was also aware of the policies about disclosure of patient information contained in the training module. The training module makes clear employees should not allow relatives into a room when a patient's PHI is read unless given consent by the patient. *Id.* at 10, 14. In regards to a minor's PHI, the slides inform trainees that Alabama law requires minors over the age of fourteen to consent to the release of their PHI to anyone, including their parents or guardians. (Doc. 21 at 21.) Greene stated in her deposition that she understood the protections that patients and specifically minors received under HIPAA as presented in the training module. (Greene Depo. at 76-79.)

### B. MRI PROCEDURE AT FMC

The Radiology Department is located in FMC in several adjacent rooms. The MRI area of the Radiology Department consists of two connected rooms, a control room and a scan room, which are divided by a large plate glass window so the radiology tech sitting in the control room can monitor patients in the scan room. The control room contains a desk with computers and monitors. The door leading out of the control room to a patient waiting area is always locked and displays an "Authorized Personnel Only" sign.

When a patient is to receive an MRI, the radiology tech receives a message on the computers located in the control room with the patient's identifying

information. The radiology tech leaves the control room to the adjacent waiting room and calls a patient into the control room. The radiology tech then interviews the patient in the control room about her personal and medical information. When the interview is complete, the tech walks the patient into the scan room where the MRI machine is located and then returns to the control room. The radiology tech then conducts MRI scans by using the computer in the control room while supervising the patient through the two-way window.

When the MRI machine scans a patient, the images of the scan appear on the monitor in the control room. The radiology tech reviews the images as they appear on the screen to ensure they are usable. After the MRI is complete, the radiology tech discharges the patient and sends the MRI scans to a radiologist for review.

### C. THE MARCH INCIDENT

On March 5, 2014 Greene was scheduled to work in the MRI control room of the Radiology Department. (Greene Depo. at 139.) At approximately 10:00 a.m. Greene saw the name of a minor patient who was to receive an MRI. (Greene Depo. at 140.) Greene went to the waiting room and called the minor patient who was with her mother to go to the control room. The minor patient's mother stood up to accompany her daughter, but Greene told her that she could not come because there was no room in the scan room for the minor patient's mother to wait

during the MRI scan. (Greene Depo. at 143-44.) Greene and the minor patient entered the control room, and Greene began to go over the minor patient's history form with her. (Greene Depo. at 147-48.)

Greene states she had finished going through the minor patient's history form and was about to input the information into the computer, when there was a knock at the control room door. (Greene Depo. at 147-48.) Greene opened the door, and allowed her daughter, age 17, and niece, age 15, to enter into the control room without asking the minor patient's consent to do so. Greene had been expecting her daughter to come to the FMC that day, because her daughter had communicated to her mother that she had a headache and was leaving school. (Greene Depo. at 153-56; 183.) Upon their arrival at FMC, Greene's daughter and niece had asked John Files ("Files"), Greene's supervisor, where they could find their mother. (Greene Daughter Depo. at 30-31.) Files had told the girls to check in the MRI room. *Id.* Files did not accompany Greene's daughter and niece to the room. (Greene Daughter Depo. at 31-32.)

Greene's daughter and niece went to the same school as the minor patient and the three children recognized and spoke to each other in the control room. (Greene Depo. at 151-52; 170-71.) Greene has given conflicting answers whether she asked the minor patient about PHI after Greene's daughter and niece entered

the control room. (Greene Interrog. ¶ 5 (Q: "Describe where you were standing as well as where the minor patient was located when your daughter and niece walked into the MRI room. State … exactly what words were exchanged between all people in the room." A: "I asked the patient if she had ever had an MRI before and she said no."); Greene Depo. at 150 (Q: "So right now you're saying you can't recall if you [asked any questions of the minor patient once your daughter and niece entered the scan room]? A: "Not to my knowledge." Q: "So you don't remember if you did or not?" A: "I do not.").)

Greene led the minor patient into the scan room and then returned to the control room to carry out the MRI. Greene's daughter and niece were present during the minor patient's MRI and were able to see the procedure through the window separating the scan and control room. (Greene Depo. at 173-76.) As the minor patient received her MRI, scans taken from the MRI appeared for Greene's review in the control room where her daughter and niece were present. (Greene Depo. at 176.) Greene admits that the presence of her daughter and niece before and during the minor patient's MRI violated DCH policy and HIPAA, (Greene Depo. at 181), and that she did not ask for the minor patient's consent before allowing her daughter and niece into the control room or any time during the procedure. (Greene Depo. at 185.)

After the completion of the MRI and the minor patient's discharge, Plaintiff's supervisor Files entered the control room to tell Greene that there was "a big problem" because the minor patient's mother had complained about the way the MRI was conducted to FMC's administration. (Greene Depo. at 195.) Files told Greene that she would need to speak with JoAnn Nichols ("Nichols"), Assistant Administrator, Head of Compliance for FMC about the incident. (Greene Depo. 196-97.) Greene spoke with Nichols before 12:00 p.m. that same day in Nichols' office. Nichols' report on the March Incident was submitted to DCH Human Resources and to the HIPAA Compliance Office for DCH on the same day. (Doc. 21 Def.'s Ex. 24.) Two days later on Friday March 7, 2014, Mildred Black, a representative of DCH's Compliance Department, and Files interviewed Greene about the March Incident. (Greene Depo. at 204-05.) Following the interview Files told Greene that he would contact her to schedule another meeting to occur on the following Monday about the March Incident. (Greene Depo. at 206.) According to Files, the March Incident was the only incident in his sixteen years at FMC where a complaint was raised in the Radiology Department about a HIPAA violation. (Files Depo. at 15.)

On Monday March 10, 2014, Greene went to DCH to discuss the incident and investigation with Mildred Black, the in-house general counsel, a

representative of Human Resources, and Files. At that meeting they told Greene that her employment was terminated because she had violated HIPAA. (Greene Depo. at 207.) Greene's termination notice, effective March 10, 2014, indicated she was fired for "inappropriate behavior" defined as "PHI Privacy Breach."(Doc. 21 Def.'s Ex. 25.) Following Greene's termination, DCH reported the privacy breach to the Office of Civil Rights, Department of Human Health and Human Services, but the office took no action on the violation. (*See* Doc. 21 Def.'s Ex. 31.)

### D. ADDITIONAL FACTS RELATING TO FMC RADIOLOGY DEPARTMENT

The parties agree that it was a regular practice for the Radiology Department employees' children to be present at the hospital. Greene and Greene's daughter also allege that during the same time period children were allowed in areas where confidential PHI was displayed on computer screens and procedures were being performed on patients. (Greene Depo. at 220, 225; Greene Daughter Depo. at 60-68.) They give no specific instances or proof of this conduct, but Greene states slightly more specifically that Files performed MRIs with his children present in the control room. (Greene Depo. at 224-25.) Greene's daughter states that Files and one other employee allowed children into the control room while MRIs were being performed. FMC disputes that other employees allowed their children to have access to PHI or that MRIs were performed in rooms with children present.

### E. THE BRANDON RICKMAN MRI

In addition to the facts surrounding the March Incident, Greene has also amended her opposition to summary judgment to include allegations that Files exposed confidential PHI to third parties during the MRI of Brandon Rickman (Rickman) at FMC in February 2016. Rickman was a high school basketball player living in Fayette, Alabama when he received an X-Ray and MRI at FMC. Rickman states that he first received an X-Ray of his elbow from Christi Nelson, a radiology technician for FMC. (Rickman Depo. at 23-24.) A student radiology technician, Kassidy Moore ("Moore"), was also present for Rickman's X-Ray. *Id*. at 24. Rickman remembers Christi Nelson asking for his consent before allowing his father into the room and that he said he wanted his father present. *Id.* at 23.

Files and Moore then gave Rickman an MRI, with Moore, Rickman's father, and Rickman's friend, Drew Guy ("Guy"), also present. Rickman and Moore state that Files asked for Rickman's consent before allowing Rickman's father or Drew Guy to view the procedure. (Rickman Depo. at 25; Moore Aff. ¶ 7; *see also* Files Aff. ¶ 4 (stating Files asked for Rickman's consent to allow Rickman's father and Guy watch the procedure *before* entering the MRI room).) Rickman gave his consent for his Father and Guy to be present.

Files began the MRI with Rickman located in the scan room, and Moore, Files, Rickman's father, and Guy in the control room. Sometime during the MRI, Files states that Rickman's friend Chance Stevenson ("Stevenson") knocked on the door of the control room and asked to come in. Files and Moore state that before allowing Stevenson to enter the room, Files asked Rickman by means of the intercom whether it was ok for Stevenson to come into the control room. (Files Aff. ¶ 7; Moore Aff. ¶ 8.) According to Files and Moore, Rickman gave Files a "thumb up" in response; Rickman took this as a sign of Rickman's assent and allowed Stevenson in the control room. (Files Aff. ¶ 7; Moore Aff. ¶ 8.)

Rickman stated during his deposition that he does not remember whether Files asked for his consent for Stevenson to be in the control room or not. (Rickman Depo. at 28.) Greene's daughter and husband both state that on two separate occasions in July and August of 2016 Rickman told them that Files did not ask for Rickman's consent before allowing any of his teammates in to view the MRI procedure. (Doc. 35 at Exs. A & B.) Rickman did not dispute in his deposition that he told Greene's daughter and husband this, but states that he does not remember what exactly occurred. Nor did Rickman or his father complain about this incident to the hospital, and there is no showing in the record that FMC knew about any potential infraction.

## III.    PROCEDURAL HISTORY

Following her termination, Greene filed a discrimination charge on April 4, 2014, with the Equal Employment Opportunity Commission ("EEOC") alleging she was fired because of her sex. (Doc. 21 Def.'s Ex. 26.) That charge was dismissed by the EEOC on January 16, 2015, and Greene received her right to sue with her dismissal notice. (Doc. 9.)

Greene also made a claim for unemployment benefits with the Alabama Department of Labor. The Department found that Greene was disqualified for unemployment compensation because she was fired for work-related misconduct. (Doc. 21 Def.'s Exs. 27 & 28.) Greene appealed this finding to the Alabama Department of Labor Board of Appeals, which affirmed the denial of unemployment compensation on April 23, 2015. (Doc. 21 Def.'s Ex. 28.)

Greene then filed this lawsuit against FMC under Title VII which outlaws discriminatory employment decisions based on an employee's gender. *See* 42 U.S.C. § 2000e *et seq*. Defendant submitted a Motion for Summary Judgment on October 3, 2016. After fully briefing the Summary Judgment Motion, Greene filed a Motion to Reopen Discovery, on the basis of Rickman's statements concerning the MRI he received from Files in February 2016. The Court gave the parties leave to depose Rickman, which occurred on March 17, 2017. Defendant then submitted a

Supplemental Motion for Summary Judgment (doc. 48), which is now briefed and ripe for review.

## IV. STANDARD OF REVIEW

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues to be resolved at trial. *Anderson,* 447 U.S. at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015)

(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## V. DISCUSSION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). Discrimination claims under Title VII are typically categorized as either single-

motive or mixed-motive claims.[1] *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016).

A plaintiff can prove her discrimination claims by either direct or circumstantial evidence. *Id.* at 1236-37 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)). Where, as in Greene's case, a plaintiff attempts to prove intentional discrimination using circumstantial evidence, the Court applies the *McDonnell Douglas Corp. v. Greene* burden-shifting framework to evaluate single-motive or "pretext" discrimination claims. *Quigg*, 814 F.3d at 1238 n.7; *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (per curiam).

Under *McDonnell Douglas*, the plaintiff carries the initial burden of producing circumstantial evidence sufficient to prove a *prima facie* case of discrimination. 411 U.S. 792, 802 (1973); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999). Making a *prima facie* case is not a high bar; "it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). If

---

[1] Greene first raised a mixed-motive argument in her Opposition to Defendants' Motions for Summary Judgment, arguing that FMC terminated her because of her gender *and* because of her work violations. (Doc. 27 at 27-31). Because the Court ultimately finds in this Opinion that FMC did not fire Greene because of her gender, all that remains of Greene's mixed-motive claim is that FMC fired Greene for violating patient confidentiality.

the plaintiff meets her initial burden of establishing a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133, 197 L. Ed. 2d 176 (2017). If the defendant is successful, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

### a. GREENE'S PRIMA FACIE CASE OF SEX DISCRIMINATION

To establish a *prima facie* case of gender discrimination under a single-motive, pretext theory, Greene must show that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Trask*, 822 F.3d at 1192 (quoting *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam)). Greene satisfies the first, second, and fourth elements for the establishment of her *prima facie* case. (*See* Doc. 19 at 21.) As a female, Greene is a member of a protected class, FMC's termination of Greene was an adverse employment action, and Greene was qualified as a licensed radiology technician

and had worked for FMC for over twenty years. (Doc. 19 at 13.) The parties dispute whether FMC treated similarly-situated male employees more favorably. Greene points to Files, her supervisor, as well as eighteen other FMC employees in various departments as comparators or "similarly-situated employee[s] who committed the same violation of work rules, but who [were] disciplined less severely than [the Plaintiff]." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276 (11th Cir. 2008).

### i.   JOHN FILES IS NOT A SIMILARLY SITUATED COMPARATOR.

When evaluating an allegation of disparate treatment, the comparator must be "similarly situated to the plaintiff in all relevant respects." *Stone & Webster Const., Inc. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012) (quoting *Rioux*, 520 F.3d at 1280). When seeking to find a proper comparator from a pool of co-employees, the Court should not ask whether the employees hold the same job titles, but whether the employer subjected them to different employment policies. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) (citing *Lathem*, 172 F.3d at 793). The parties agree that while Files was Greene's direct supervisor, both were subjected to the same privacy and HIPAA policies by FMC. Files is a proper comparator to Greene in this aspect of their employment.

Because FMC subjected Greene and Files to the same employment policies, the Court must next determine "whether the employees are involved in or accused

of the same or similar conduct and are disciplined in different ways." *Rioux*, 520 F.3d at 1280 (quoting *Burke-Fowler*, 447 F.3d at 1323). The Eleventh Circuit utilizes a "nearly identical" standard to determine whether the conduct and respective punishment of two employees are sufficiently similar for establishing a *prima facie* case of discrimination. *Stone*, 684 F.3d at 1134-35 (holding that the Department of Labor's Administrative Review Board had incorrectly relied on a "similar misconduct" standard which had been expressly set aside in favor of the "nearly identical" standard) (citing *Burke-Fowler*, 447 F.3d at 1323 n.2). The "nearly identical" standard does not require that the comparators are the "plaintiff's dopplegangers" but requires "much more than a showing of surface-level resemblance." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2510 (2016). The "quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler*, 447 F.3d at 1323 (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Greene contends that Files is a proper comparator because he (1) told Greene's daughter and niece to find Greene in the control room during the minor patient's MRI and (2) allegedly failed to ask for Rickman's consent before allowing

a third party to view his MRI. (Doc. 27 at 17-18; Doc. 53 at 4.) According to Greene, FMC treated John Files more favorably because he was not investigated or disciplined in either case. (Doc. 27 at 14-15; Doc. 53 at 4-6.) Greene argues that FMC's failure to investigate and discipline Files, "who was equally, if not more, responsible for the technical HIPAA violation," (doc. 27 at 26), proves that her termination was motivated by gender animus.

Files instruction to Greene's daughter and niece to find Greene in the MRI room does not constitute "nearly identical misconduct." The parties dispute the semantic difference of whether Files told the girls to "go into the MRI room" or merely to "check in the MRI room." (*See* Doc. 19 at 34.) The difference in phrasing does not change the result of the Court's analysis. As the MRI technician overseeing the minor patient in the scan room, it was Greene's responsibility to ensure compliance with HIPAA. It is undisputed that Greene allowed her daughter and niece into the control room during an MRI procedure without the minor patient's consent in violation of HIPAA. (Doc. 27 at 8-10.) Greene has not shown that Files knew an MRI was occurring when he directed Greene's daughter and niece to the control room. Nor does Greene claim that Files instructed her to allow her daughter and niece into the MRI room. Her claim is in essence that by directing the children to where they could find their mother, Files became ultimately liable

for any ensuing privacy and HIPAA violations by Greene. Files' actions cannot be said to be "nearly identical" to Greene's willful disregard of HIPAA when she allowed her daughter and niece to enter the locked room and then proceeded to perform an MRI on the minor patient in the children's presence. As Greene herself has recognized, she had four alternate choices when her daughter and niece knocked on the door to avoid a HIPAA violation. (Greene Depo. at 185-86.) Specifically, Greene could have (1) not admitted her daughter and niece, (2) called another technician to continue the minor patient's MRI, (3) have the minor patient wait while she spoke with her daughter and niece, or (4) asked for the minor patient's consent before allowing her daughter and niece into the room. *Id*. Her failure to do so does not make Files equally culpable for her actions.

Greene's allegation that Files failed to obtain the consent of Brandon Rickman before allowing Stevenson into the control room is also not sufficiently similar to her own HIPAA violation. Greene points to Greene's daughter's and husband's affidavits that Rickman told them that Files had not obtained Rickman's consent before allowing his teammates to observe the procedure. (Doc. 35 Exs. A & B.) However, these affidavits are contradicted by Rickman himself, who during his deposition said he was unsure of whether Files had obtained his consent, but did say that he wanted his parents and teammates present during the MRI. (Rickman

Depo. at 26, 50-51.) Further, both Files and Moore stated under oath that they had witnessed Rickman's "thumbs up" gesture and that Files had relied on that gesture as implied consent. (Doc. 48 at 9.)

Putting aside credibility determinations and construing this contradictory testimony in Greene's favor, Files alleged misconduct is far from "nearly identical" to Greene's willful violation of HIPAA. It is undisputed that Rickman himself wanted his teammates present. (Rickman Depo. at 50-51.) In contrast, Greene's admitted HIPAA violation resulted in an immediate complaint to the hospital from the minor patient's parents, and thus FMC's knowledge of the violation. There is no evidence indicating that FMC was aware of any potential HIPAA violation by Files. In order for there to be disparate treatment, an employer must be aware of the comparator's violative conduct and choose to mete out a lesser sanction. *See Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 658-59 (11th Cir.1998) (an employee who may have broken a rule but was not caught was not similarly situated to one who had been caught); *see also Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000) (an employee who admitted to improper conduct to her employer was not similarly situated to one who did not). To show that she was treated more harshly than Files, it would be necessary for Greene to prove that FMC had knowledge of Files' potential violation and that it

took no investigatory or disciplinary actions against him in spite of this knowledge.

Greene's allegations that Files is a proper comparator fail because she has not

shown "nearly identical" conduct.

ii. GREENE CANNOT SHOW THAT ANY OTHER SIMILARLY
SITUATED EMPLOYEE ENGAGED IN "NEARLY IDENTICAL
CONDUCT"

Greene asserts that even if Files is not a proper comparator, she has

successfully identified approximately eighteen[2] other reported complaints of

HIPAA violations or violations of the DCH Confidentiality policy that could

support a reasonable jury's inference that FMC's decision to fire her was for

discriminatory reasons. (Doc. 27 at 18.) FMC shows through the affidavit of Sheila

Limmroth, the Corporate Director of Compliance and Audit for the DCH Health

System, that of nineteen reported violations identified by Greene, thirteen were

due to an FMC employee accessing his or her own medical file, three were due to

an FMC employee accessing a family member's medical file, and one was due to an

FMC employee accessing the medical file of a patient who had transferred medical

facilities. (Doc. 33 at 8.) Only one of these incidents was by a male and only one

other violation was a "disclosure" violation like Greene's, but it was by a female.

*Id.* Because seventeen of the eighteen identified incidents involved female co-

---

[2] FMC identifies nineteen, rather than eighteen violations. The discrepancy does not affect the Court's analysis because the additional violation was by a female co-employee of Greene.

employees, Greene cannot rely on those incidents to support her *prima facie* case for sex discrimination. *Trask*, 822 F.3d at 1192.

The last of the eighteen incidents identified by Greene involved a male co-worker, but the employee in that incident was verbally reprimanded for accessing *his own* personal health information and medical records. (Limmroth Aff. at ¶ 13.) Greene's violation was disclosure of PHI to a third party, where the male co-employee's violation was accessing of his own PHI. The two violations differ in scope, level of intrusiveness, and consent of the patient; they are thus far from "nearly identical." *Stone*, 684 F.3d at 1134-35. Comparing these two vastly different violations amounts to comparing of "apples with oranges," which is disallowed under Eleventh Circuit precedent. *Burke-Fowler*, 447 F.3d at 1323 (quoting *Maniccia*, 171 F.3d at 1368).

Greene lastly asserts that at other MRI technicians, including Files, allowed their children into the control room while MRIs were being performed. (Doc. 27 at 18 n.6.) As evidence of this alleged technical violation, Greene submits her own testimony and that of her daughter. *Id.*[3] Greene does not allege that the co-employees' children were present without the patient's consent. *Id.* at 18 n.6 ("Greene has also alleged that Files and MRI technicians had allowed their

---

[3] Greene also relied on an affidavit of Cindy Renfroe for her accusation that other employees allowed their children into the MRI room during procedures. However, Greene later moved the Court to withdraw this affidavit, (doc. 43), which the Court granted. (Doc. 44.) The Court does not consider the Cindy Renfroe affidavit in its analysis.

children into the MRI room while procedures were being performed at various times."). She has submitted no evidence that the children's presence was a violation of FMC policy or HIPAA regulations, nor does she allege any conduct with enough specificity for the Court to determine specific violations. Further, Greene presents no evidence that FMC knew of the potential violations, making any potential violation not "nearly identical."

Having failed to present evidence of a sufficient comparator, Greene has failed to establish a *prima facie* case of discrimination. Accordingly, FMC's Motions for Summary Judgment are due to be GRANTED on Plaintiff's Title VII claim.

### b. FMC's Legitimate, Non-Discriminatory Reason for Greene's Termination

Even if Greene had met her burden of making a *prima facie* case of discrimination, FMC has produced a legitimate, nondiscriminatory reason for its termination of Greene—because she exposed the minor patient's PHI to a third party without the minor patient's consent. (Doc. 19 at 36.) Under FMC's Privacy and Security Violation Discipline Guide, disclosing a patient's PHI to another person without their consent is grounds for immediate termination and possible referral to authorities and licensing boards. (Doc. 21 at 29-30.) It is without

question that this confidentiality violation was a legitimate, non-discriminatory reason for Greene's termination.

<h3>c.      GREENE'S FAILURE TO DEMONSTRATE THAT FMC'S PROFFERED REASON IS PRETEXTUAL</h3>

If an employer carries its burden of producing a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework "drops from the case" and "the factual inquiry 'proceeds to a new level of specificity.'" *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)). "To avoid summary judgment, [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks*, 446 F.3d at 1163 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). The plaintiff may succeed in demonstrating pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Springer v. Convergys Customer Mgmt. Group. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (plaintiff can demonstrate that the employer's proffered reason is pretextual by revealing "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in the defendant's reasoning). In determining whether the proffered reason is pretextual, courts are not in the "business of adjudging whether employment decisions are prudent or fair" but instead are solely concerned with "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Greene attempts to show pretext by arguing that FMC's explanation for her firing is false and unworthy of credence. (*See* Doc. 27 at 26-27; Doc. 53-1 at 5-6.) In support of this contention she alleges that (1) FMC's investigation into the March Incident was "minimal at best," (2) that "one of the decision makers was Files, the very individual who was equally, if not more, responsible for the technical HIPAA violation," and (3) that at her unemployment compensation hearing, FMC's representative was unable to articulate what PHI Greene actually disclosed. (Doc. 27 at 26-27; Doc. 53-1 at 5.)

The record reflects that FMC's investigation into the March Incident was anything but minimal. Within an hour of the complaint by the minor patient's mother, an FMC compliance officer met with Greene and took her full statement about what happened. (Doc. 20 at 54-55.) Two days later, Greene was interviewed by Mildred Black, Files, and a HIPAA Compliance Director. (Greene Depo. at 203;

Limmroth Aff. at ¶ 4.) At that interview, Greene had the chance to explain her actions. The following Monday, Greene again had an opportunity to discuss the incident in a meeting with Mildred Black, the in-house general counsel, a representative of Human Resources, and Files. (Limmroth Aff. at ¶ 5.) FMC's investigation into the matter was far from "minimal." Greene was given multiple opportunities to contest FMC's disciplinary actions.

Second, Greene's reiteration of her argument that Files was responsible for the privacy violation, not her, fails because it does not show FMC's reason for firing her was pretextual. "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance. *Holifield*, 115 F.3d at 1565. That Greene thinks Files is responsible for her patient privacy violation is immaterial to the pretext analysis:

> [a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

Third, Greene's contention regarding FMC's representative's failure to fully articulate Greene's violation at the EEOC hearing does not show that FMC's proffered reason for her firing is unworthy of credence. Greene admitted that her

actions regarding the minor patient violated HIPAA and that FMC told Greene she was being terminated for the disclosure of patient information without consent. (Doc. 20 at 49, 57-58.) That a representative of FMC was unable to later specify the minor patient's PHI disclosed by Greene does not matter, because FMC believed that Greene had committed a violation at the time of the firing.

### d. GREENE CANNOT PRODUCE SUFFICIENT CIRCUMSTANTIAL EVIDENCE TO SURVIVE SUMMARY JUDGMENT

Greene also argues her lack of comparator evidence does not doom her claim because enough circumstantial evidence has been presented to create a "reasonable inference of intentional discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 28 (11th Cir. 2011). Even if a plaintiff fails in their *McDonnell Douglas* claim "[a] triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.'" *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Board of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)). *Smith* held summary judgment was inappropriate on the plaintiff's claim even in absence of a proper comparator because there was substantial evidence of discriminatory racial animus, including documented racial tensions following a workplace shooting resulting from racism against black employees. *Id.* at 1329–30.

Greene has not presented a "convincing mosaic" of evidence because circumstantial evidence of gender-motivated animus is entirely lacking in this case. She simply repeats the claims of her *prima facie* case that (1) FMC treated Files more favorably by failing to investigate his role in Greene's HIPAA violation; (2) multiple other employees violated HIPAA in technical ways but received only warnings; and (3) there was a long history at FMC of employees, including Files, allowing their own minor children access to sensitive patient care areas. (Doc. 27 at 13 and 22.)

## VI. CONCLUSION

Greene failed to both prove a *prima facie* case of discrimination and demonstrate pretext as to FMC's proffered reasons for terminating her. Further, Greene has not presented evidence to create a reasonable inference of discrimination. As a result, FMC's motions for summary judgement are due to be GRANTED, and Greene's claims dismissed. An Order consistent with this Opinion will be entered separately.

**DONE** AND **ORDERED** ON SEPTEMBER 18, 2017.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485